UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| v. | ) Crim. No. 05-83-B-W |
| | ) |
| BARBARA JEAN PEARSON, | ) |
| | ) |
| Defendant | ) |

**RECOMMENDED DECISION**

On August 31, 2006, I held an evidentiary hearing on defendant's motion to suppress. Pearson, an owner of a small fuel oil business in the Lincoln/Howland area, is charged in an eight count indictment with a variety of offenses involving misapplication of $5000.00 or more from a program receiving federal funds, misuse of a social security account number, and bankruptcy fraud. On April 10, 2002, agents executed a search warrant at her home in Enfield, Maine, and during the course of that execution they interviewed Pearson. Claiming that the agents violated her <u>Miranda</u> rights by continuing to question her after she requested to speak with her attorney, Pearson has moved to suppress all statements made by her to Agents Eric Hafener and Lindsay Lewis. I now recommend that the court adopt the following proposed findings of fact and deny the motion to suppress.

**Proposed Findings of Fact**

On April 10, 2002, Agents Eric Hafener and Lindsay Lewis, special agents assigned to the Inspector General's office of the Department of Health and Human Services participated in the execution of a search warrant at the Pearson residence in Enfield, Maine. Given the nature of this investigation, involving a number of federal

agencies, and the fact that there were police reports and bankruptcy filings that suggested there would be firearms in the residence, what might be perceived as a larger than normal contingent of officers arrived at the Enfield residence at 8:00 a.m. on April 10. Between twelve and fourteen law enforcement officials, approximately ten of whom were armed and outfitted in some type of law enforcement uniform, arrived to conduct the search. Three of the participants were computer forensics experts and they were not in uniform nor did they enter the house, at least initially. The "search party" apparently consisted of five DHHS agents, two social security agents, two agents from the Maine Drug Enforcement Agency, one postal inspector, and one state police officer.

When Pearson saw the car containing Agents Hafener and Lewis, she immediately recognized it as belonging to the couple who had visited her home the previous day. Agent Lewis explained that Pearson's home was for sale and listed with a real estate broker. She and Agent Hafener had gone to the real estate agent, posing as a couple looking to purchase a house, and had been taken on a tour of the Pearson residence. Their sole purpose in doing this was to get inside the house in order to inspect the premises prior to execution of the search warrant. Pearson thought at first they had returned to view the house again, but shortly thereafter she realized the true purpose of the visit.

Upon entry Pearson was briefly detained in the kitchen area while the premises were secured. With her in the kitchen/living room area were her two children, aged six months and three and one-half years. Pearson was dressed in shorts and a t-shirt, her nightwear from the prior night. Once the premises were secured Pearson was escorted to a sofa and asked to take a seat. Agents Hafener and Lewis then commenced their

interview, with Hafener being the primary interrogator and Lewis merely an observer. Hafener informed Pearson she was not under arrest, but he nevertheless advised her of her rights under Miranda v. Arizona, 384 U.S. 436 (1966). From that point on, the two accounts of the next five to six hours differ dramatically.

According to Hafener and Lewis, after Hafener explained the Miranda warning Pearson indicated that she would speak with the agents and agreed to waive her rights. Hafener has absolutely no recollection of her mentioning the name "Marvin Glazier" and maintains he never heard that name until after this case was pending and the United States Attorney advised him of the name of Pearson's lawyer. Hafener questioned Pearson about a variety of matters during the course of the interview. While the agents agree that they were in the house until well after 2:00 p.m., both Lewis and Hafener maintain the actual interview of Pearson was much shorter than five hours. While Pearson made a number of statements that might be viewed as incriminating, neither agent suggests that she "confessed" fully to the crimes under investigation. During the search Pearson was free to smoke, move from room to room, tend to her children and do anything else within reason. She was even free to leave the residence after the interview as is evidenced by the undisputed fact that when her husband returned from a doctor's appointment she left with him and spent the remainder of the time at a neighbor's house. Pearson herself also volunteered that during the search a nephew somehow arrived on the scene and she gave him a copy of the search warrant to take to Martha Harris, her husband's attorney.

Pearson tells a very different version of what occurred after the Miranda warning was given, although she agrees that she was advised of her rights. She says that she told

the agents she did not want to talk with them and she wanted to call her attorney Marvin Glazier.  The agents refused to let her use a phone and they told her all the phones in the residence had been unplugged.  According to Pearson she was not allowed to leave the sofa and her six-month-old infant was left to fend for himself for five hours without a diaper change, food, or any comfort from his mother when he cried.  According to Pearson she asked the agents several times if she could attend to her children and they refused  to allow it, telling her she better just answer their questions.  Pearson also says that agents threatened to call the State Department of Human Services and have her children removed from the house if they located any evidence of drugs.  According to Pearson she asked several times to make a phone call and was repeatedly denied the opportunity.  Even when Hafener and Lewis finished questioning her, she remained on the sofa guarded by a Maine State Trooper.  Pearson says she asked to change her clothes and get her contact lenses and the officers would not allow it.  Hafener and Lewis deny these accusations and maintain that Pearson was allowed to do almost anything she wanted to do, except interfere with the search of the premises or place the officers in a situation that might have been dangerous.

   Confronted with these two conflicting accounts, I am satisfied that it is more likely than not that what occurred at the Pearson residence was the version of events described by the agents.  In is simply incredulous that these agents would prohibit Pearson from tending to her crying, soiled, hungry six-month-old child if she had asked to do so.  Finding that portion of her story not worthy of belief, I also question the credibility of most of the rest of her story.  I have no doubt that Pearson felt intimidated by the circumstances and the presence of so many officers, but I do not find that the

4

officers did anything to coerce a statement from her. I find that she never invoked her Miranda rights and she spoke with the officers voluntarily. Even though Pearson was never formally arrested on the day in question, I am satisfied that for purposes of this recommended decision what occurred was a "custodial interrogation." I am further satisfied that the agents fully complied with their Miranda obligations.

### Discussion

Pearson originally moved to suppress her statements on the ground that they were obtained in violation of her rights under the Fifth Amendment of the United States Constitution as delineated in Miranda v. Arizona, 384 U.S. 436 (1966), and Dickerson v. United States, 530 U.S. 428 (2000), in that they were obtained after she had invoked her right to remain silent and her right to consult with counsel. See Coppola v. Powell, 878 F.2d 1562, 1567 (1st Cir. 1989) and United States v. Andrade, 135 F.3d 104, 107 (1st Cir. 1998). At the evidentiary hearing she seemed to also be asserting that the statements were involuntary as they were only obtained after the agents threatened to take her children away and held her against her will for an unnecessarily long period of time.

My resolution of the factual issues in this case also resolves this legal issue. I am satisfied that Pearson waived her Miranda rights and agreed to speak with the officers. She never asked to call "Marvin Glazier" or any other attorney. Nor did Pearson invoke her right to remain silent.

The remaining question raised by Pearson's version of events, of course, is whether or not the defendant's statements were voluntarily made. The burden is on the government to prove that the defendant's statements were voluntary by a preponderance of the evidence. Lego v. Twomey, 404 U.S. 477, 489 (1972). The government must show

that, based on the totality of the circumstances, the investigating agents neither "broke" nor overbore the defendant's will, Chambers v. Florida, 309 U.S. 227, 240 (1940), and that her statements were "the product of a rational intellect and a free will," Blackburn v. Alabama, 361 U.S. 199, 208 (1960). See also Lynumn v. Illinois, 372 U.S. 528, 534 (1963) (confession coerced by police telling accused that state financial aid for her infant children would be cut off, and her children taken from her, if she did not cooperate). As this language suggests, "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary'." Colorado v. Connelly, 479 U.S. 157, 167 (1986). In the context of the present case, the agents' conduct was exemplary in that they fully informed Pearson of her Miranda rights and were polite and low key throughout the interview. There is no evidence that their behavior was unduly coercive. Pearson was in full control of her faculties, albeit probably nervous about her situation. Based upon the totality of the circumstances, I am satisfied that the statements made by Pearson and her decision to cooperate with the authorities were voluntary acts under applicable federal precedent. She was not threatened with the loss of her children nor did the agents interfere with her ability to care for the children.

## Conclusion

Based upon the foregoing, I recommend that the court adopt these proposed findings of fact and deny the motion to suppress. (Docket No. 37).

### NOTICE

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which *de novo* review by the district court is sought, together with a supporting memorandum, and request for oral argument before the district judge, if any is sought, within ten (10) days of being served with a copy thereof. A responsive

memorandum and any request for oral argument before the district judge shall be filed within ten (10) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

/s/Margaret J. Kravchuk
U.S. Magistrate Judge

Dated: September 5, 2006